Zimco Electric Supply Company v. Commissioner. J. B. Zimmerman, Jr., and Faye Zimmerman v. Commissioner.
Zimco Electric Supply Co. v. Commissioner
Docket Nos. 3729-67 and 3730-67.
United States Tax Court
T.C. Memo 1971-215; 1971 Tax Ct. Memo LEXIS 120; 30 T.C.M. (CCH) 878; T.C.M. (RIA) 71215; August 25, 1971, Filed *120 Held, petitioner-corporation was not reasonably entitled to a bad debt deduction for its fiscal year ended October 31, 1964, in excess of that addition necessary to increase its reserve for bad debts to 4.5 percent of its total accounts and notes receivable. Held, further, petitioner-corporation has not proved respondent's disallowance of alleged entertainment and sales expense erroneous. Held, further, as a result of the disallowance of these entertainment expenses, individual petitioners received constructive dividends as determined by respondent. 879 Held, further, individual petitioners did not receive dividend income of $9,023.54 in 1964 in connection with the issuance to them of a promissory note. Held, further, individual petitioners received interest income in the amounts of $476.88 and $883.37 in 1964 and 1965, respectively, the years in which the interest was credited and made unqualifiedly available to them. Brooks L. Harman, American Bk. of CommerceBldg., Odessa, Tex., for the petitioners. David E. Gaston, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The Commissioner determined the following deficiencies in income tax: Taxable
Year Closed
Docket No.
Petitioner(s)
as of
Deficiency
3729-67
Zimco Electric Supply Company
10-31-64
$2,675.89
10-31-65
85.50
3730-67
J. B. Zimmerman, Jr., and Faye
12-31-64
3,200.97
Zimmerman
12-31-65
816.95
Due *121 to certain concessions, the issues remaining for decision are as follows: Docket No. 3729-67 1. Whether Zimco Electric Supply Company was reasonably entitled to a bad debt deduction for its fiscal year ended October 31, 1964, in excess of that addition required to increase its reserve for bad debts to 4.5 percent of its total accounts and notes receivable. 2. Whether respondent properly disallowed certain club dues and entertainment expenses in the amounts of $567.67 and $516.51 which petitioner-corporation claimed as deductions for its fiscal years ended October 31, 1964, and October 31, 1965, respectively. Docket No. 3730-67 3. Whether the individual petitioners received dividend income from Zimco Electric Supply Company in the amounts of $535.67 and $486.51 for the calendar years 1964 and 1965, respectively, as a result of the payment by petitioner-corporation of some of their personal nondeductible living expenses (club dues and expenses). 4. Whether the individual petitioners received dividend income from petitioner-corporation in 1964 in the amount of $9,023.54 in the form of a promissory note from Zimco Electric Supply Company to petitioner J. B. Zimmerman, Jr. 5. Whether *122 the individual petitioners received $476.88 and $883.37 of interest income in the taxable years 1964 and 1965, respectively. Findings of Fact General The parties stipulated some facts. These stipulations and the exhibits attached thereto are incorporated herein by this reference. J. B. Zimmerman, Jr. (hereinafter referred to as petitioner or J. B.) and his wife Faye Zimmerman (hereinafter Faye) timely filed joint Federal income tax returns for the taxable years 1964 and 1965 with the district director of internal revenue in Dallas, Tex. They were residing in Odessa, Tex., as of the date their petition was filed. Petitioner Zimco Electric Supply Company (hereinafter Zimco or petitioner-corporation) which was incorporated in Texas on November 18, 1955, also timely filed corporate income tax returns for its fiscal years ended October 31, 1964, and October 31, 1965, with the district director in Dallas. Its principal office was located in Odessa, Tex., as of the date its petition was filed. Zimco was primarily a wholesale electrical distributor, although it also engaged in electrical contracting work during the earlier years of its existence. J. B. was president, operating manager, and *123 one of the three directors of Zimco from its inception through the years at issue. As president he was one of petitioner-corporation's two officers, and he alone was given authority to draw checks against Zimco's accounts in the First National Bank of Odessa, Tex. Faye was not employed by Zimco during the years before us. 880 Throughout the period January 2, 1962, through October 31, 1965, J. B. owned 50 percent of the 6,000 shares outstanding of Zimco which had elected on November 1, 1958, to be taxed as a small business corporation under the provisions of subchapter S of the Internal Revenue Code of 1954. This election was terminated during the fiscal year ended October 31, 1964, by reason of the failure of Sheldon Mixson to file a timely consent after having received from his father, James T. Mixson, 100 shares of Zimco stock on July 31, 1964. Reserve for Bad Debts Petitioner-corporation, an accrual-basis taxpayer, used the reserve method of deduction for bad debts from the time of its incorporation through the years at issue. Its reserve for these years was consistently computed as 10 percent of year-end total accounts receivable and it consistently filed a statement with its *124 tax returns as required by the regulations under section 166 of the Internal Revenue Code of 1954. [1] The following is a schedule of Zimco's year-end totals for the fiscal years 1958 through 1966, as reflected in its books and records: Accounts Re-
Portion of
ceivable ac-
Amounts
Reserve
Accounts
tually charged
added to
for
Receivable
Fiscal
off and
Reserve
Bad Debt
in excess
against
Year Ended
Notes
Accounts
Reserve
Account
Balance
of 90 days
Account
10-31-58
$88,825.88
$1,420.04
$2,841.38
$8,822.59
10-31-59
1,250.95
122,458.65
4,250.54
7,673.82
12,245.87
19,645.94
10- 31-60
9,398.55
92,050.68
4,714.89
1,674.09
9,205.07
27,201.06
10-31-61
9,387.74
132,961.36
3,800.24
7,891.31
13,296.14
25,358.45
10-31-62
9,387.74
111,523.50
5,909.17
3,765.38
11,152.35
25,566.96
10-31-63
7,387.74
111,508.38
7,433.50
7,431.99
11,150.84
[2] 10-31-63
7,387.74
137,341.47
2,899.67
5,482.98
13,734.15
28,879.26
[3] 10-31-65
7,409.29
135,970.94
2,035.48
1,898.92
13,597.59
30,833.43
10-31-66
122,371.60
[4] 9,923.52
8,563.09
12,237.16
Zimco's *125 actual average bad debt ratio for the period of six fiscal years ending October 31, 1964, was 4.123 percent of the total accounts and notes receivable for that period computed as follows: (Average Total Accounts and Notes Receivable Charged off as Bad Debts - 11-1-58 through 10-31-64 5,168.00 / (Average Total Accounts andnotes Receivable - 11-1-58 through 10-31-64) 125,340.75 = 4.123 (actual average bad debt ratio - 11-1-58 through 10-31-64) In contrast, the average bad debt ratio of Zimco over the same six-year period when computed on the basis of average total accounts receivable as compared with average total accounts receivable charged off yearly against the reserve for bad debts is 4.098 percent. [5]
On the basis of the above two percentage figures, respondent arrived at a 4.5 percent factor which he used in computing the additions to bad debts allowable to Zimco for the years involved herein. Zimco claimed a deduction in the amount of $7,482.98 for "bad debts" on its tax return for the fiscal year ended October 31, 1964. Respondent disallowed *126 this deduction and determined by use of a 4.5 percent factor that petitioner-corporation was entitled to deduct no more than $261.64 for "bad debts" in that year. [6] 881 Zimco had computed its bad debt deduction for the years involved as follows: 1964
Ten percent of total corporate accounts
$13,734.15
receivable at 10-31-64
Corporate reserve for bad debts as of 11-1-63
$11,150.84
Less accounts receivable charged off during
2,899.67
fiscal 1964 against reserve for bad debts
Reserve for bad debts at 10-31-64 prior to
8,251.17
computing fiscal 1964 addition
Addition to reserve for bad debts in order to
$ 5,482.98
increase reserve to 10 percent, or $13,734.15, of
total accounts receivable
Add loans receivable deducted in fiscal 1964 as
2,000.00
bad debts
Deduction for "bad debts" per return for year
$ 7,482.98
ended 10-31-64
1965
Ten percent of total corporate accounts
$13,597.59
receivable at 10-31-65
Corporate reserve for bad debts as of 11-1-64
$13,734.15
Less accounts receivable charged off during
$ 2,035.48
fiscal 1965 against reserve for bad debts
Reserve for bad debts at 10-31-65 prior to
$11,698.67
computing fiscal 1965 addition
Addition to reserve for bad debts in order to
$ 1,898.92
increase reserve to 10 percent, or $13,597.59, of
total accountsreceivable
Add loans receivable deducted in fiscal 1965
2,000.00
asbad debts
Deduction for "bad debts" per return for year
$ 3,898.92
ended 10-31-65
*127 Respondent, on the other hand, determined that a maximum reserve for bad debts maintained at a balance equal to 4.5 percent, instead of 10 percent, of the total outstanding accounts and notes receivable would be reasonable. He made this determination in light of Zimco's past experience and in accordance therewith computed its allowable deduction for "bad debts" as follows: Balance 10-31-64
Accounts receivable
$137,341.47
Notes receivable
7,387.74
Total
$144,729.21
Experience factor as determined
4.5%
Corrected reserve
$6,512.81
Reserve balance November 1, 1963
$11,150.84
Charge-offs during year
n7 4,899.67
Tentative reserve balance before
6,251.17
allowable addition
Bad Debt reserve addition and allowable
$ 261.64
deduction
* * *
Balance 10-31-65
Accounts receivable
$138,203.93
Notes receivable
5,387.74
Total
$143,591.67
Experience factor as determined
4.5%
Corrected reserve
$ 6,461.63
Reserve balance
November 1, 1964
$6,512.81
Charge-offs during year
[7] 4,035.48
Tentative reserve balance before
2,477.33
allowable addition
Bad Debt reserve addition and allowable
$ 3,984.30
deduction 882 Entertainment Expenses During the period October *128 1963 through 1965, a membership account was maintained with the Odessa Country Club (hereinafter sometimes referred to as the Club) in the name of "J. B. Zimmerman, Jr., Zimco Electric Supply Co." The club facilities were used a total of 14 days during fiscal and calander year 1964. They were used 20 days during fiscal year 1965 or 19 days during calendar year 1965. Payment for the use of the Club was on a charge basis. No cash expenditures were allowed. All chits in connection with the aforementioned uses of the Club were signed by either J.B., his wife Faye, or their son Roger, who was approximately 11 or 12 years old at that time. Over half of the total number of chits in each of the years at issue were signed by Faye or Roger and covered such items as french fries, cokes, pepsis, hamburgers, coffee, tea, swimming guests, and other similar personal items. Petitioner-corporation regularly received monthly itemized statements, as well as individual chits, from the Club which indicated charges for the aforementioned uses of the Club during the month in question, as well as charges for club dues and assessments. It paid charges totaling $567.68 [8] and $516.51 [9] for the fiscal years ended *129 October 31, 1964, and October 31, 1965, respectively, and claimed deductions therefor as entertainment and sales expenses. Respondent disallowed these deductions in full on the ground that they were not allowable under sections 162 and 274. Moreover, he determined that the disallowed entertainment deductions constituted dividend income to the individual petitioners for the corresponding calendar tax years 1964 and 1965. Sometime in the early part of 1966, internal revenue agent Robert L. Thomas reviewed the Odessa Country Club monthly statements and the individual tabs which pertained to the period October 1963 through October 1965. At that time, there were no notations on the face of these documents to indicate whether the expenditures were personal or for business. However, when these items were introduced into evidence at trial, there were some notations thereon such as "El Paso Products Bill Reagan & family," "Brown Elect. Glenn Brown & family," and "West *130 Tex. Elect. * * * Reynolds & wife." Some of these tabs on which there were notations were signed by Faye, not by J. B. Promissory Note Dated January 4, 1964 Zimco had made a practice during its corporate history of borrowing from its stockholders. The amount of a loan usually corresponded to a stockholder's share of the previously taxed undistributed income. These loans were evidenced by negotiable promissory notes bearing six percent annual interest. Zimco reported subchapter S income to J. B. for its fiscal year ended October 31, 1963, in the amount of $9,062.38. The full amount of $9,062.38, including an investment credit of $38.84, was reported by him as subchapter S income on the joint Federal income tax return filed by him and his wife for calendar year 1963. On January 4, 1964, petitioner-corporation issued a one-year negotiable promissory note to J. B. in the amount of $9,023.54, with six percent interest per year from the date thereof. Zimco's analysis account of J. B.'s undistributed earnings indicated an amount of $9,062.38 owing to him as of October 31, 1963. This account was balanced out to $9,023.54 as of the same date by a charge of $38.84 representing the tax credit. *131 As of October 31, 1964, the amount of $9,213.75, composed of the aforementioned $9,023.54 balance plus a $190.21 restoration of investment tax credit as of that date, was transferred to the petitioner-corporation's analysis account of notes payable to J. B. and was listed therein as "transfer undistributed surplus." On November 1, 1965, Zimco executed a one-year negotiable promissory note to J. B. in the amount of $14,899.23. This note was composed of the following: 883 Balance of note for fiscal year ended October 31, 1962
$ 7,732.98
Plus:
October 31, 1964, accrual of interest
$476.88
October 31, 1964, investment credit restoration
190.21
October 31, 1963, balance of J. B.'s undistributed
9,023.54
9,690.63
earnings account (renewal of note dated Jan. 4, 1964)
$17,423.61
Less:
October 31, 1964, credit to J. B.'s accountsreceivable
for December 31, 1963, and August 31, 1964, payments
by Zimco to Internal Revenue Service on behalf of
J. B.
$2,047.50
January 31, 1965, payment of October 31, 1964, accrued
476.88
2,524.38
interest
$14,899.23 The following are balance sheets of petitioner-corporation, as given on its tax returns, for the years at issue: Item
FY 10-31-64
FY 10-31-65
Assets
Cash
$36,626.82
$31,334.66
Notes and Accounts Receivable
Less: Reserve for Bad Debts
130,995.06
129,994.08
Inventories
96,088.25
142,943.69
Prepaid Expenses
2,453.64
3,345.34
Buildings and other fixed depreciable assets
Less: Accumulated amortization and depreciation
22,386.80
13,154.39
Land (net of any amortization)
800.00
800.00
Other assets
590.76
590.76
Total Assets
$289.941.33
$322,162.92
Liabilities and Capital Accounts payable
$131,053.60
$151,279.39
Mortgages, notes, and bonds payable in less than 1
24,205.04
20,119.55
year
Accrued Bonuses
13,532.00
15,050.00
Loans from Stockholders (undistributed earnings)
31,758.91
35,379.24
Mortgages, notes, and bonds payable in 1 year or
3,998.25
more
Federal income tax
4,642.77
4,546.98
Capital Stock: common stock
60,000.00
[10] *132 80,000.00
Earned surplus and undivided profits
20,750:76
15,787.76
Total liabilities and capital
$289,941.33
$322,162.92 Respondent determined that the promissory note for $9,023.54 payable to J. B. and dated January 4, 1964, constituted a dividend to him in 1964 in the face amount thereof. Interest Income The Zimco analysis account of notes payable to J. B. indicated the accrual of interest as of October 31, 1964, and October 31, 1965, in the amounts of $476.88 and $883.37, respectively. These respective amounts were added to the balances then outstanding in this account and were paid on January 31, 1965, and December 31, 1966, respectively. The individual petitioners reported interest income from petitioner-corporation only in the years it was actually paid to them. They reported interest income from Zimco in the amounts of $210 and $476.88 for the years 1964 and 1965, respectively. Respondent determined that the aforementioned amounts of accrued interest constituted income for the year in which each amount was accrued, rather than for the year it was paid, on the ground that the accrued interest was constructively received in the year it was credited to J. B. and made available to him. J. B. exercised considerable control over the affairs of petitioner-corporation. *133 Book entries of Zimco indicate that it paid certain personal obligations of petitioner, such as his Federal income tax liabilities. 884 Opinion Reserve for Bad Debts Petitioner-corporation, in using the reserve method of deduction for bad debts from its inception through the years at issue, consistently computed its reserve for these years as 10 percent of year-end total accounts receiveable. Respondent deterthat Zimco was not reasonably entitled to a bad debt deduction for its fiscal year ended October 31, 1964, [11] in excess of that addition necessary to increase its reserve for bad debts to 4.5 percent of its total accounts and notes receiveable. Petitioner-corporation argues that its computation of the bad debt reserves and additions thereto was reasonable. We hasten to point out that it is not sufficient for Zimco to prove its method reasonable. It must also demonstrate that respondent acted unreasonably in disallowing the additions for the years involved, and, therefore, abused the discretion given to him by section 166(c).[12] *135 Massachusetts Business Development Corp., 52 T.C. 946 (1969); *134 Roanoke Vending Exchange, Inc., 40 T.C. 735 (1963); Maverick-Clarke Litho Co., 11 T.C. 1087 (1948), affd. 180 F. 2d 587 (C.A. 5, 1950); and Ehlen v. United States, 323 F. 2d 535 (Ct. Cl. 1963). See also Petaluma Co-Operative Creamery, 52 T.C. 457 (1969), and Samuel Swartz, 42 T.C. 859 (1964). Moreover, "the burden of proof on a taxpayer regarding the respondent's determinations is greater than the usual burden which faces the taxpayer who seeks to overcome the presumption of correctness which attaches to respondent's ordinary notice of deficiency." Roanoke Vending Exchange, Inc., supra, at 741. See also S.W. Coe & Co. v. Dallman, 216 F. 2d 566 (C.A. 7, 1954); Massachusetts Business Development Corp., supra; R. Gsell & Co., Inc., 34 T.C. 41 (1960), reversed on other grounds [61-2 294 F. 2d 321 (C.A. 2, 1961); Platt Trailer Co., 23 T.C. 1065 (1955); Ehlen v. United States, supra; and Paramount Finance Company v. United States, 304 F. 2d 460 (Ct. Cl. 1962).
The purpose of a reserve for bad debts is not to acquire protection against the contingency of excessive losses in subsequent years. Massachusetts Business Development Corp., supra.See also S.W. Coe & Co. v. Dallman, supra, and Citrus Motors Ontario, Inc. v. United States, 249 F. Supp. 425 (S.D.Cal., 1965). Itsfunction, rather, is to absorb those expected future losses that are attributable to current transactions. Roanoke Vending Exchange, Inc., supra; Ira Handelman, 36 T.C. 560 (1961); and Ehlen v. United States, supra. Petitioner-corporation appears to have lost sight of the intended purpose of its bad debt reserves by stating on brief that "it wouldn't take but one bankrupt contractor to wipe out the reserve at any time." The contingency that a contractor may become bankrupt in the future is not to be protected by section 166(c), unless there are circumstances which make it reasonable to expect that this will occur. Here, we have no evidence whatsoever indicating that any of the contractors with which Zimco dealt could be expected to become bankrupt. Instead, we only have petitioner-corporation's bare assertions of such a possibility. Furthermore, the record *136 is void of any evidence showing that any one account receiveable was large enough to "wipe out" the bad debt reserve. On brief, petitioner-corporation states that as its total accounts receivable increased its reserve was consistently maintained at 10 percent thereof. First of all, it is noteworthy that Zimco's accounts receivable did not increase consistently over the fiscal period 1959 through 1965. Furthermore, on the record before us, we see little virtue in the consistency which petitioner-corporation applauds because it appears to have resulted in unreasonable additions to the bad debt reserves during the years in question. In the instant case, respondent used Zimco's bad debt history and determined that its reasonable reserve for bad debts during the years at issue was a percentage of its total notes and accounts receivable no greater than its average percentage of bad debts over the previous six-year period. Specifically, respondent arrived at a 4.123 percent average ratio of Zimco's bad debts 885 to total accounts and notes receivable for a six-year period ending October 31, 1964. The average bad debt ratio to total accounts receivable for the same period was computed by respondent *137 to be 4.098 percent. It was, therefore, determined by respondent that petitioner-corporation is reasonably entitled to use a 4.5 percent factor in computing its reserve and the addition thereto for each of the years involved. Although we have previously approved of such a method in Black Motor Co. 41 B.T.A. 300 (1940), we also noted therein that a taxpayer's bad debt history is not the sole criterion which could be used in computing a reasonable bad debt reserve. However, we will sustain the use of such a method by respondent where the reserves computed thereby are not proved unreasonable. See Black Motor Co., supra; Ehlen v. United States, supra. Petitioner-corporation has not in any way attempted to illustrate the unreasonableness of the determination made by respondent. Instead, the record indicates that respondent acted reasonably because Zimco's bad debt experience during the years in question in fact turned out to be no greater than that allowed for by respondent. Zimco has not introduced evidence which would render its bad debt history meaningless in determining its bad debt reserves for the years involved. There is no indication whatsoever in the record of serious economic *138 depression affecting the electrical supply industry. Furthermore, we have no proof that there was a change in Zimco's business activities nor that there were certain accounts or notes which probably would not be collectible. In summary, petitioner-corporation did not prove the existence of specific doubtful accounts or notes that would require reserves greater than those permitted by respondent. Mill Factors Corporation, 14 T.C. 1366 (1950); Maverick-Clarke Litho Co., supra. Therefore, we hold that respondent's determination must be sustained since petitioner-corporation did not establish to our satisfaction that it was unreasonable. One further note is in order. Zimco insists that its reserves are reasonable. As we have previously indicated, a finding that a taxpayer's method of computing his bad debt reserve is reasonable is not sufficient to disturb respondent's determination unless the taxpayer can prove that respondent acted unreasonably and hence abused his discretion. On the record herein, not only has petitioner-corporation failed to show that respondent abused his discretion, but it did not convince us that its method was reasonable. Over the seven-year period ending October *139 31, 1965, the actual accounts receivable charged off in each year, except fiscal year ended October 31, 1960, constituted less than 50 percent of the available bad debt reserve. Without further clarifying evidence with respect thereto, this fact indicates to us that Zimco's reserves were unreasonably large. Petitioner-corporation points out on brief that its bad debt reserve balance was "drastically reduced" by reason of the fact that $9,923.52 was charged against the reserve account in its fiscal year ended October 31, 1966. We observe that this was the first time Zimco had charged off notes receivable against its reserve for bad debts. Previously, in each of the fiscal years 1964 and 1965, it had specifically deducted as bad debts $2,000 in notes receivable. The fact that Zimco charged off all its notes receivable in fiscal year 1966, without any justification in the record for such action, does not persuade us to conclude that Zimco needed the additions to its reserve which it claimed in fiscal years 1964 and 1965. Furthermore, the record is void as to whether the factors which resulted in a greater amount of notes and accounts being charged off in fiscal year 1966 were either traceable *140 to or known to exist during the years at issue. In summary, there are too many unknown factors relating to this abnormally large charge-off to warrant attaching great importance to it in weighing petitioner-corporation's assertions with respect to the additions claimed for the years at issue. See Roanoke Vending Exchange, Inc., supra.
Entertainment Expenses Zimco paid $567.67 and $516.51 in fiscal years ended October 31, 1964, and October 31, 1965, respectively, in connection with the use of the Odessa Country Club. It deducted these amounts on its respective tax returns for those years as entertainment and sales expenses. Respondent disallowed these deductions in full as not allowable under sections 162 and 274. He additionally determined that the disallowed entertainment deductions constituted dividend income to the individual petitioners for their taxable years 1964 and 1965. 886 We must sustain respondent on this issue. Notations such as "El Paso Products Bill Reagan & family" and "Brown Elect. Glenn Brown & family" were jotted down on some individual tabs from the club. These notations were not made at the time of the expenditure, but were made sometime during the period 1966 *141 to 1969. J.B. had first testified that he believed that these notations were on the individual tabs at the time they were paid by Zimco. He subsequently retracted his statement and testified that he could not definitely state that the notations were present at the time of payment. The only key we have as to the relationship to Zimco of those individuals and the others indicated on the chits is the testimony of J.B. that petitioner-corporation obtained the business of customers like West Texas Electrical Company and El Paso Products Company as a result of the membership in the Odessa Country Club. J.B. did not testify as to each use of the club during the years in question. His recollection appears at best hazy. We have found as a fact that the notations were not put on the tabs until after the respondent's audit was commenced. J.B. testified that he was the one who wrote them on the chits. Yet the earliest date that he could have done so was in 1966, one to two years subsequent to the actual dates of the entertaining. We, therefore, accord very little weight to those notations and to J.B.'s testimony with respect thereto. In light of the record on this issue, we are not justified in *142 assuming that each individual tab upon which was jotted down the names of Zimco's customers represented a business expenditure. In summary, we remain unpersuaded as to the "business" [13] entertaining which Zimco engaged in during the years at issue. Moreover, Zimco failed to meet both the substantive requirements of section 274(a), [14] *143 *144 and the substantiation requirements of section 274(d). [14] With respect to the club dues, on the record herein, petitioner-corporation has not established that the club was used primarily in furtherance of its business nor that the expenditures at the club were directly related to the active conduct of its trade or business. Section 274 (a)(1)(B). In connection with the deductibility of the individual expenditures at the club, Zimco has failed to prove that each item was directly related to or associated with the active conduct of its trade or business. Section 274(a)(1)(A). Furthermore, petitioner-corporation did not substantiate by adequate records or by sufficient evidence corroborating its own statement all four elements required by section 274(d). In particular, the identity of the persons entertained, the business purpose of the expense, and the business relationship of the persons entertained and using the club were not substantiated 887 because of the unreliability of the notations on the chits and of J.B.'s testimony in connection therewith. We hold accordingly that *145 respondent properly disallowed the entertainment and sales expenses in each of the years involved. Any expenditure made by a corporation for the personal benefit of its stockholders may result in the receipt by them of constructive dividends. John L. Ashby, 50 T.C. 409 (1968). See also Eugene A. Mohr, 45 T.C. 600 (1966). The individual petitioners have failed to establish that the individual expenditures and the dues paid to the Odessa Country Club were not for their benefit. Indeed, the record supports respondent's determination and reveals that over half of the total number of chits in each of the years at issue were signed by Faye or Roger, the individual petitioners' son. These tabs were for personal items such as food and beverage. Accordingly, respondent's determination that the individual petitioners received constructive dividends totaling $535.67 and $486.51 in calendar years 1964 and 1965, respectively, is sustained. Promissory Note Dated January 4, 1964 As of November 1, 1963, petitioner-corporation was no longer entitled to the status of a small business corporation under subchapter S of the Internal Revenue Code of 1954 because a new stockholder failed to consent to such *146 status. On January 4, 1964, Zimco executed a one-year negotiable promissory note in the amount of $9,023.54, payable to J.B. with six percent interest per year from date of issue. Respondent determined that J.B. received a taxable dividend in the face amount of this note. The individual petitioners argue that the note was merely evidence of a loan made by J.B. to Zimco on October 31, 1963. As we understand their position, they contend that there was some type of constructive distribution to J.B. on that date of his share of the corporate earnings which were taxable [15] *147 to him by reason of the subchapter S provisions of the Code. On the same date, according to petitioners, J.B. made a loan to petitioner-corporation in the same amount. They further assert that the subsequent issuance of a note by Zimco on January 4, 1964, merely evidenced the indebtedness incurred as of October 31, 1963. They explain away Zimco book entries made on October 31, 1964, reflecting a transfer of $9,213.75 [16] from J.B.'s undistributed earnings account to his notes payable account as "house-cleaning" entries. Respondent, on the other hand, contends that the issuance of the promissory note to J.B. constituted a distribution out of Zimco's earnings and profits and is thus taxable to him as a dividend in the face amount thereof. We hold that J.B. did not receive a dividend of $9,023.54 in 1964. Petitioner-corporation had a history of borrowing money from its stockholders, as is revealed from the corporate records and corporate minutes. [17] These indicated that the undistributed earnings of the corporation attributable to the shareholders were the source of the loans and interest-bearing notes were issued in the amounts the stockholders loaned the corporation in each instance. In particular, the minutes of the board of directors' meeting of December 5, 1963, state: It was proposed and agreed that the Board representing 100% of the stock of the corporation as individual stockholder *148 would continue to lend the corporation undistributed earnings at 6% per annum and * * * [would] execute notes to evidence such loans. The parties agree that a note dated January 4, 1964, and bearing interest from that date was issued to J.B. in the amount of $9,023.54, which was his share of the undistributed earnings for the year ended October 31, 1963. We conclude from an examination of the facts and circumstances before us that J.B. nade a bona fide loan to Zimco of $9,023.54. Having found that J.B. made a bona fide loan to petitioner-corporation, it logically follows that there must have been a distribution to him, albeit constructive, of money in an amount equal to the amount of the loan, viz, the face amount of the 888 note. It is as if there were a distribution to J.B., followed by an immediate loan back to Zimco. In fact, petitioner argues that this is what occurred on October 31, 1963. Despite the fact that the note was not issued until January 4, 1964, and that interest did not begin to run until that date, we find from an examination of the record as a whole that J. B. loaned Zimco as of October 31, 1963, the amount of earnings attributable to him. Therefore, the note dated *149 January 4, 1964, was merely evidence of that indebtedness. The constructive distribution of $9,023.54 to J.B. constituted a distribution of previously taxed income. Interest Income Petitioner-corporation accrued interest in the amounts of $476.88 and $883.37 on October 31, 1964, and October 31, 1965, respectively, on the balances then outstanding in its liability account "Notes Payable Officer J.B. Zimmerman." It paid these respective amounts to petitioner in 1965 and 1966, and he reported the interest as income in the year of payment rather than the year of accrual. Respondent determined that the interest was unqualifiedly made available to petitioner in the year of accrual, and that he, therefore, constructively received $476.88 and $883.37 in interest income in 1964 and 1965, respectively. We agree with respondent. Petitioner was president of Zimco during the years at issue, and as such, he exercised control over the conduct of its business. He alone was given the authority to draw checks against petitioner-corporation's bank accounts at the First National Bank of Odessa, Tex. Furthermore, book entries of petitioner-corporation reveal that Zimco paid certain personal obligations *150 of petitioner. The amount of these payments was then credited against and reduced the balance of the notes payable to J.B. Thus, it is apparent that petitioner could have had Zimco pay the accrued interest directly to himself or use it to pay some of his personal obligations instead. On the record herein, we are convinced that once the interest in question was credited to J.B.'s notes payable account, he had the right to and could have drawn upon it any time thereafter. See section 1.451-2(a), Income Tax Regs. We feel Elmer J. Benes, 42 T.C. 358 (1964), affd. 355 F. 2d 929 (C.A. 6, 1966), is analogous to the instant case. In the Benes case, we held that the taxpayer constructively received salary from a corporation, of which he was the president and controlling stockholder, in the year the salary was credited to his account. We pointed to such facts as the authority of the taxpayer as president of the company to write checks on its bank accounts and to the ample cash position of the company in the year at issue. Certainly, there is no question here that Zimco did not have adequate cash to pay the interest accrued. The control [18] and power of petitioner over petitioner-corporation *151 is also manifest from the record. These facts, when coupled with Zimco's history of paying personal obligations of J.B., lead us to conclude, and we so hold, that petitioner constructively received $476.88 of interest income in 1964 and $883.37 of interest income in 1965. See Young Door Co., Eastern Division, 40 T.C. 890 (1963); Platt Trailer Co., 23 T.C. 1065 (1955); and James J. Cooney, 18 T.C. 883 (1952). Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 in effect during the years in question. ↩
2. $2,000 notes receivable additionally considered as bad debt. ↩
3. $2,000 notes receivable additionally considered as bad debt. ↩
4. Includes $6,878.48 notes receivable.↩
5. This average bad debt rate was arrived at by dividing the average total accounts receivable charged off by the average total accounts receivable.↩
6. Respondent also used the 4.5 percent factor in fiscal year ended October 31, 1965. However, this resulted in an increase in the bad debt reserve addition and a corresponding decrease in Zimco's taxable income for that year.↩
7. This amount includes $2,000 in notes receivable that were additionally deducted as bad debts.↩
8. Of this total amount, $370 represented club dues and the remainder was for individual charges. ↩
9. Club dues totaling $386 were included in this total. The remaining portion of the claimed deduction constituted individual charges.↩
10. Increase in capital stock account was due to stock dividend.
11. See footnote 6, supra, as to the bad debt reserve addition for fiscal year ended October 31, 1965.↩
12. SEC. 166. BAD DEBTS. * * * (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.
13. Our use of this word refers to expenditures for purposes considered ordinary and necessary within the meaning of sections 162 and 212.↩
14. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation. - (1) In general. - No deduction otherwise allowable under this chapter shall be allowed for any item - (A) Activity. - With respect to an activity which is of a type generally considered to constitute entertainment, * * * unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion * * *, that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility. - With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarly for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion * * * the portion of such item associated with, the active conduct of the taxpayer's trade or business. * * ** * * (d) Substantiation Required. - No deduction shall be allowed - * * * (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, * * * * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense * * *, (B) the time and place of the travel, entertainment * * *, (C) the business purpose of the expense * * *, and (D) the business relationship to the taxpayer of persons entertained, * * *. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.
15. The full amount of $9,062.38, with a $38.84 investment tax credit, was reported and paid by J.B. and his wife as Subchapter S income on their tax return for 1963. 16. This amount includes restoration of an investment credit of $190.21 as of that date.↩
17. Respondent concedes in his reply brief that petitioner-corporation "did on occasion receive loans from its shareholders * * * [that] were * * * evidenced by notes * * *."↩
18. We are aware that petitioner owned 50 percent of the stock of Zimco, while the taxpayer in the Benes case owned 99.4 percent of the stock in the corporation involved in that case. However, we do not feel on the record herein that 50.1 percent stock ownership is required to indicate the considerable control petitioner exercised over Zimco.↩